1  LOUIS A. HIGHMAN, State Bar No. 61703
   BRUCE J. HIGHMAN, State Bar No. 101760
2  HIGHMAN, HIGHMAN & BALL
   A Professional Law Association
3  870 Market Street, Suite 467
   San Francisco, CA 94102
4  Telephone:  (415) 982-5563
   Facsimile:  (415) 982-5202
5
6  Attorneys for Plaintiff Debra Springer-Bowman

7

8

9              In the United States District Court

10        In and for the Northern District of California

11                      San Jose Division

12
   DEBRA SPRINGER-BOWMAN,              Civ. No.
13
                   Plaintiff,
14
       -v-                            COMPLAINT FOR DAMAGES--
15                                    VIOLATION OF TITLE
                                      VII (42 U.S.C. SECTIONS
16 BRIDGE BANK OF SILICON VALLEY,     2000e(2) and 2000e(3);
   N.A.; BRIDGE BANK, N.A.;           VIOLATION OF AMERICANS
17 BRIDGE CAPITAL HOLDINGS,           WITH DISABILITIES ACT
                                      (29 U.S.C. SECTIONS
18              Defendants.           12112 ET SEQ.);
                                      VIOLATION OF 29 U.S.C.
19 _____/  SECTION 206(d) (EQUAL
                                      PAY ACT); VIOLATION OF
20                                    CALIFORNIA FAIR
                                      EMPLOYMENT AND HOUSING
21                                    ACT; VIOLATION OF
                                      CALIFORNIA LABOR CODE
22                                    SECTION 1197.5

23                                    DEMAND FOR JURY TRIAL

24
        Plaintiff Debra Springer-Bowman alleges as follows:
25
                   JURISDICTION AND VENUE
26
        1.   This Court has original jurisdiction of the First
27
   Cause of Action herein, which is brought under Title VII of
28

_____
Complaint—Bowman v. Bridge Bank, et al        1

1    the 1964 Civil Rights Act, and specifically under 42 U.S.C.

2    Sections 2000e-2, 2000e-3, and 2000e-5.    The Court has

3    original jurisdiction of this action under 28 U.S.C. Section

4    1331 and 28 U.S.C. Section 1343.

5        2. This Court has original jurisdiction of the Second

6    Cause of Action herein, which is brought under the Americans

7    with Disabilities Act (29 U.S.C. Sections 12112 et seq.).    The

8    Court has original jurisdiction of this action under 28 U.S.C.

9    Section 1331 and 28 U.S.C. Section 1343.

10        3.    This Court has original jurisdiction of the Third

11    Cause of Action herein, which is brought under the Equal Pay

12    Act, and specifically under 29 U.S.C. Section 206(d).    The

13    Court has original jurisdiction of this action under 28 U.S.C.

14    Section 1331 and 28 U.S.C. Section 1343.

15        4.    This Court has pendent jurisdiction of the Fourth

16    Cause of Action, which is for violation of the California Fair

17    Employment and Housing Act.

18        5.    This Court has pendent jurisdiction of the Fifth

19    Cause of Action, which is for violation of California Labor

20    Code Section 1197.5.

21        6.    The unlawful actions of defendants Bridge Bank of

22    Silicon Valley, N.A., Bridge Bank, N.A., and Bridge Capital

23    Holdings and their unlawful employment practices herein

24    alleged were committed in the State of California and in the

25    San Jose division of the judicial district of this Court.

26                        FIRST CAUSE OF ACTION

27        (Violation of Title VII Against Defendants Bridge Bank of

28

1  Silicon Valley, N.A., Bridge Bank, N.A., and Bridge Capital

2  Holdings)

3      7.  Plaintiff refers to the allegations of paragraphs 1-

4  6 of this complaint, and incorporates the same herein by this

5  reference as though set forth in full.

6      8.  Plaintiff Debra Springer-Bowman is a female resident

7  of the State of California, and of the County of Santa Clara

8  and this judicial district, and a citizen of the United

9  States.

10     9.  Plaintiff is informed and believes that defendant

11  Bridge Bank of Silicon Valley, N.A. has at all relevant times

12  referred to herein been a national banking association, with

13  its headquarters located at 55 Almaden Blvd., San Jose, Santa

14  Clara County, California.

15     10.  Plaintiff is informed and believes that defendant

16  Bridge Bank, N.A. has at all relevant times referred to herein

17  been a national banking association, with its headquarters

18  located at 55 Almaden Blvd., San Jose, Santa Clara County,

19  California.

20     11.  Plaintiff is informed and believes that defendant

21  Bridge Capital Holdings has at all relevant times referred to

22  herein been a corporation or some other entity, with its

23  headquarters located at 55 Almaden Blvd., San Jose, Santa

24  Clara County, California.

25     12.  Plaintiff is informed and believes that

26  Bridge Bank of Silicon Valley, N.A., Bridge Bank, N.A., and

27  Bridge Capital Holdings (hereinafter collectively referred to

28

1  as "Bridge Bank") were plaintiff's employers.  Plaintiff
2  started working for Bridge Bank on or about July 1, 2005, and
3  felt forced to resign from her employment with Bridge Bank on
4  or about July 24, 2007.

5      13.  In or about August 2004, plaintiff received a call
6  from Mike Field, who was at the time the leader of the asset-
7  based lending practice for Bridge Bank.  Mr. Field indicated
8  that Bridge Bank was now formally rolling out its technology
9  practice, and asked plaintiff if she would be interested in
10  talking with the management team about leading the new group.

11      14.  Plaintiff expressed interest in the job, and began
12  the interview process, which included meeting with the
13  executive management team (Dan Myers, Tom Sa, Tim Boothe, and
14  Mike Bondy).

15      15.  Plaintiff was then contacted and asked to come in
16  for interviews with the Board.

17      16.  In the interim, Mike Field asked to meet with
18  plaintiff.  Mr. Field opened with the statement that
19  plaintiff was a "B-list candidate for the position as head of
20  the Technology Group".  He then asked plaintiff if she could
21  think of any other candidates who might be a better fit.

22      17.  Plaintiff found the meeting with Mr. Field awkward,
23  and immediately following it, plaintiff contacted the CEO to
24  ask that her application be withdrawn from the candidate
25  pool.  After plaintiff's scheduled meeting with the Board was
26  cancelled, Rich Brenner (a Director of Bridge Bank) and
27  plaintiff spoke, and he asked her why she had withdrawn her
28

1  interest.  Mr. Brenner told plaintiff that she had been the

2  number one candidate, and that he was surprised by her

3  action.  Plaintiff did not disclose to Mr. Brenner her

4  reasons for withdrawing her interest in the position, and

5  subsequently took a work opportunity with another bank.

6      18.  During June 2005, Mike Field again contacted

7  plaintiff and indicated that a manager of the new technology

8  group had now been identified, but that it had not yet been

9  formally announced so he could not disclose names.  However,

10  he assured plaintiff that this person was someone who highly

11  regarded plaintiff and her skill set in technology banking,

12  and asked if plaintiff would give consideration to join the

13  team.  Plaintiff agreed to an interview with Mike Field and

14  another Bridge Bank employee named Dan Pistone.  Dan Pistone

15  was introduced to plaintiff as the new Team Leader of the

16  Technology Banking Group.  Plaintiff was told that if she

17  decided to join Bridge Bank, she would be reporting to Dan

18  Pistone.

19      19.  Following the interview, plaintiff was offered the

20  position of VP Relationship Manager by defendants, which was

21  a step down from the Senior Vice President title plaintiff

22  had attained with a previous employer.  However, plaintiff

23  was promised and assured by defendants that by joining at

24  this early stage, there would be an opportunity for her to

25  regain the SVP title and to manage her own team as the

26  division grew. Initially, the team would consist only of Dan

27  Pistone and plaintiff, so there would not be anyone for

28

1  plaintiff to manage at that time.

2      20.  Although Mike Field would still not disclose the

3  name of the new Division Manager, plaintiff placed trust in

4  the assurances she had received.  Based on the assurances and

5  promises made by defendants to plaintiff, as aforesaid,

6  plaintiff accepted the offer of employment, and joined Bridge

7  Bank on or about July 1, 2005.

8      21.  On the day that plaintiff joined Bridge Bank, the

9  new Division Manager was announced.  It was Mike Field.

10  Plaintiff immediately harkened back to the interview session

11  she had had back in 2004 with Mike Field during which he had

12  told plaintiff that she was a B-list candidate, which had

13  caused plaintiff to withdraw her application for that very

14  same Division Manager job.

15      22.  During April 2006, as plaintiff approached her

16  first anniversary with Bridge Bank, the portfolio had grown,

17  the team was growing, plaintiff's time commitment to her

18  position was significant, her duties were commensurate with

19  those that she had when she had been a Senior Vice President

20  for a previous employer, and she had been filling in for her

21  immediate supervisor, Dan Pistone, during his business and

22  vacation absences (which meant for about six weeks a year,

23  she was the acting team leader).  Plaintiff approached Mike

24  Field with a request that her title be changed to Senior Vice

25  President in light of all of this (and in light of the

26  assurances and representations which defendants had made to

27  her at the time of her hire).  Mike Field responded to

28

1  plaintiff's request by saying that plaintiff seemed to have a
2  sense of entitlement, and he told her that she would have to
3  "earn the title."  Plaintiff told Mike Field that she was
4  extremely surprised and disappointed with his response and
5  discontinued the conversation.
6      23.  Effective May 1, 2006, plaintiff's title with
7  defendants was changed to Senior Vice President without any
8  further conversation between Mike Field and her, and she
9  received a pay raise.  However, plaintiff did not receive any
10  additional stock options with the title change.  Plaintiff is
11  informed and believes that at least two male employees of
12  Bridge Bank were awarded additional stock options upon their
13  promotion to Senior Vice President.
14      24.  Dan Pistone told plaintiff that the reason she was
15  not awarded additional stock options at the time of her
16  promotion to Senior Vice President was simply because no
17  additional stock options were available at that time.  He
18  stated that the Bank would wait for additional stock options
19  to be authorized by the Board, and that he would follow up.
20  However, plaintiff at no time thereafter was awarded any
21  additional stock options.  Plaintiff later followed up and
22  asked defendants why she had still not received any
23  additional stock options. Defendants replied that additional
24  stock options were only awarded if the promotion included
25  management responsibilities.  Although at the time of her
26  hire plaintiff had been promised she would receive management
27  responsibilities as the technology team grew, as an
28

1  inducement for her to go to work at the Bank, she never

2  received any management responsibilities, which is further

3  referred to hereinafter.

4      25. By early April 2007, the technology team at Bridge

5  Bank had grown to thirteen employees.  All of the officers on

6  the technology team at this time were male other than Ms.

7  Springer-Bowman.  There were nine male officers and one

8  female officer (Ms. Springer Bowman) on the technology team

9  at this time; and there were also two analysts and a junior

10 relationship manager.  In short, the team had grown from two

11 persons (Ms. Springer-Bowman and Dan Pistone) when it had

12 started to thirteen persons (including both officers and non-

13 officers); and as far as officers only were concerned, it had

14 grown from two officers to ten officers.   The officers on

15 the technology team and their titles at this time were Mike

16 Field, Executive Vice President and Division Manager; Dan

17 Pistone, Senior Vice President and Group Manager; Scott

18 Chamberlain, SVP and Market Manager; Paul Gibson, SVP and

19 Market Manager; Ed Lambert, SVP and Market Manager; Bill Nay,

20 SVP and Market Manager; Ms. Springer-Bowman, SVP and

21 Relationship Manager; Derek Almeida, VP and Relationship

22 Manager; Mike Lederman, VP and Relationship Manager; Nader

23 Maghsoudnia, VP and Relationship Manager.  Additionally, the

24 following three non-officers were on the technology team:

25 Don Tran, Analyst; Sarah Norris, Relationship Manager (but

26 not a VP or officer; she was a junior RM), and Karla, an

27 Analyst.

28

1      26. During early April 2007, plaintiff requested a

2   meeting with Mr. Pistone to discuss her career path at Bridge

3   Bank. Plaintiff told him that with all work required to be

4   filtered through him, he was, through no fault of his own,

5   becoming a bottleneck in the process. Plaintiff asked for

6   the opportunity to lead her own team, ease some of his

7   workflow, and make a stronger contribution to the leadership

8   and growth of the division.

9      27. Plaintiff met with Dan Pistone on April 4, 2007 to

10  discuss her career path at Bridge Bank. Dan Pistone asked

11  that plaintiff be as specific as possible about ways in which

12  the technology team could be structured to meet her

13  objective.

14     28. In response, plaintiff described a scenario under

15  which she would be promoted to a position of team leader,

16  with the existing staff divided in such a way that some would

17  report directly to Dan Pistone and some would report directly

18  to plaintiff. Plaintiff specifically suggested that since she

19  was a Senior Vice President, Relationship Manager, she could

20  be manager of a team with one of the male relationship

21  managers (Almeida, Lederman, or Maghsoudnia) reporting to

22  her, along with a dedicated analyst. The male relationship

23  managers were all much less senior and less experienced than

24  plaintiff. Plaintiff was a Senior Vice President who was 50

25  years old at the time, and had over 30 years in banking, and

26  approximately 13 of those 30-plus years in banking had been

27  in the technology sector. The male relationship managers, on

28

1  the other hand, were not Senior Vice Presidents, but only

2  Vice Presidents, and were in their 20s and 30s (two were in

3  their 20s, and one was in his early 30s.)

4      29.  Dan Pistone, in response, said he would resist any

5  proposal that elevated anyone to become his peer as co-leader

6  of the team.  When plaintiff asked why, he responded,

7  "because I want the power."

8      30.  Pistone then explained to plaintiff that he knew he

9  was opening himself up by making the following statements,

10 but said that he would rather be honest with plaintiff than

11 tell her a bunch of BS.  He then explained to plaintiff that

12 female-led teams were not perceived to be as productive as

13 male led teams.  He said that if he promoted plaintiff, he

14 would have to promote the men on the team, suggesting that

15 the men on the team were plaintiff's equal, despite the

16 fact that plaintiff had far more years of experience in

17 banking and in the technology sector, despite the fact that

18 plaintiff's portfolio was the largest of anyone on the

19 technology team, despite the fact plaintiff had at the time

20 of her hire been promised a promotion to manager of a team

21 after the technology team would grow (which it had), and

22 despite the fact plaintiff was eminently more qualified.

23     31.  Pistone further stated that if one of the Vice

24 President Relationship Manager males were required to report

25 to plaintiff, a female (as plaintiff was suggesting), the

26 technology team would be at risk of losing the male who would

27 be reporting to plaintiff, a female. He made it clear that

28

1  the reason the team would be at risk of losing the male was
2  that the male would not want to report to a female.

3      32.  Plaintiff then suggested that if Pistone felt this
4  way, maybe she could become manager of an all female team,
5  which could consist of her as the team leader, and could also
6  have Sarah Norris (a junior Relationship Manager and not a
7  Vice President) on it, and which could also have Karla (the
8  female analyst) on it.

9      33.  Pistone rejected the idea, stating, "We can't have
10 an all female team."  When plaintiff referenced the
11 construction team as an all-female team, Pistone responded,
12 "That's the reason it failed—it was all female and it was
13 female-led."  (Note:  The leader of that team had recently
14 accepted a position with another lender and had taken one of
15 her direct reports with her.  The team had not failed.)

16     34.  Mr. Pistone did acknowledge plaintiff's strength as
17 a banker and plaintiff's contribution to the team, and he
18 said he held her in high regard.

19     35.  That same day, about 1:30 p.m., plaintiff spoke
20 with Mike Field (who was Dan Pistone's supervisor, and in her
21 vertical chain of command), and indicated that she had a big
22 issue and would like to talk with him before the end of
23 business that day.  Mr. Field's schedule would not permit,
24 but he scheduled a meeting for plaintiff for April 5, 2007 at
25 9:00 a.m.

26     36.  Later in the afternoon, on the same day of April 4,
27 2007, Dan Pistone solicited further discussion with plaintiff

28

1  to "close the loop" on the morning's conversation, i.e., how
2  the team could be configured.  Plaintiff and Mr. Pistone went
3  to Mr. Pistone's office, where plaintiff explained to Mr.
4  Pistone that her career path had taken second position in
5  order of priority following the morning's meeting.  Plaintiff
6  told him that the bigger issue had become his apparent
7  intolerance of women in leadership, and told him that she
8  could not change her gender to fit his perception of a
9  successful leader.  Pistone backpedaled and said he didn't
10 mean it the way it had come across in the morning meeting,
11 that his message was lost in his poor choice of words, etc.
12 He focused on his positive acknowledgements of plaintiff's
13 strength and restated that he held plaintiff in high regard.
14 He said he hoped that plaintiff would be able to discount the
15 words he had used that morning.  He apologized for
16 misstatements and said he would think about how he could re-
17 phrase his thoughts.  Plaintiff suggested he run the revised
18 verbiage by his wife before he brought it into my office.  He
19 said, "No, my wife's happy just being a mom and raising a
20 child."  Plaintiff told Mr. Pistone that enough had been
21 said, and that she expected that there would be no more
22 discriminatory remarks; and plaintiff agreed to move forward
23 and discuss ways in which the team could be reconfigured to
24 eliminate bottlenecks that resulted from the work of thirteen
25 employees having to run through Mr. Pistone's office.
26      37.  Following this afternoon meeting on April 4, 2007,
27 with Mr. Pistone, plaintiff felt she had handled the matter
28

1 and didn't expect it to resurface.  Plaintiff cancelled her
2 meeting with Mr. Field.

3     38.  In the morning of April 5, 2007, Mike Field
4 followed up with plaintiff and asked for more information
5 regarding the issue.  Plaintiff declined to share the
6 details, but did share the broad subject matter.  Through a
7 series of e-mail exchanges, Mike Field indicated that he had
8 a need to know the details.  Plaintiff asked Mr. Field to
9 respect her need to keep it to herself for now, believing at
10 this time that the matter had been resolved and feeling
11 concern that sharing the specifics would impair her ability
12 to continue to do the work that she enjoyed doing at Bridge
13 Bank.  Mike Field agreed, but asked if they could still meet
14 for a general discussion on April 6, 2007.  Plaintiff
15 accepted.

16     39.  Then at or about 4:00 p.m. on April 5, 2007, during
17 plaintiff's coaching of Sarah Norris, a junior female RM, for
18 a presentation to loan committee on April 6, 2007, Norris
19 shared with plaintiff that she (Norris) had sought Dan
20 Pistone's opinion prior to talking with plaintiff.  Norris
21 told plaintiff that Pistone had teased with her that if OLC
22 (the Bank's loan approval committee) started asking any weird
23 questions, she should just tell them that "they're a bunch of
24 sissies."  Norris joked back that she "wasn't going to cop an
25 attitude."  Norris and plaintiff then left the conference
26 room next to Dan Pistone's office, where he was sitting.
27 Norris and plaintiff stopped in front of Dan Pistone's
28

1  office—and plaintiff ribbed him (in front of Sarah Norris).

2  Plaintiff said, "I can't believe you coached Sarah to cop an

3  attitude in loan committee!"  Sarah Norris then said, "Well,

4  he actually told me that if OLC gives me a hard time, just

5  tell them that they are just a bunch of women." Plaintiff

6  looked at Mr. Pistone and said to him, "You can't say that."

7  At that moment, it was clear to plaintiff that her earlier

8  words were not taken seriously, that Dan Pistone's feelings

9  were real and clearly deeply embedded, and that it was now

10  imperative that the matter be elevated to protect not only

11  plaintiff's career, but also the careers of other female

12  employees.

13      40.  On April 6, 2007, plaintiff discussed the matter

14  with Mike Field.  In addition to discussing Dan Pistone's

15  sexist comments, plaintiff explained to Mike Field that Mr.

16  Pistone had also made frequent discriminatory comments about

17  ethnicity, sexual preference, and age.

18      41.  On Monday, April 9, 2007, plaintiff asked Mike

19  Field for an update on the matter.  Mr. Field told plaintiff

20  he couldn't share the details of the "process", and told

21  plaintiff she should continue to run her work through Dan

22  Pistone until further notice.  Plaintiff explained to Mr.

23  Field that she could not continue to work through Dan

24  Pistone—that a hostile work environment had been created.

25  Mr. Field replied that "At this moment, you need to

26  realize that you are making the choice not to work through

27  Dan."  Plaintiff left Mr. Field's office without

28

1  acknowledgement.

2     42.  About an hour or so later, plaintiff went back in
3  to Mike Field and explained that it was not she who made the
4  choice not to work through Dan Pistone, and re-emphasized
5  that Dan Pistone had created a hostile work environment by
6  virtue of the derogatory comments he had made from his
7  position of management with respect to women.  Plaintiff
8  likened Mike Field's instruction that she continue to "work
9  though Dan as usual" to instructions given to a rape victim
10 that she continue to work with the rapist until the matter is
11 settled.  Mr. Field nodded and said plaintiff could work
12 through him and stressed that there were several other
13 approval paths available to plaintiff in the bank.

14    43.  Around mid-day on April 9, 2007, plaintiff spoke
15 with Tom Sa, head of HR at Bridge Bank.  Plaintiff shared the
16 directions Mike Field had given her to continue to work
17 though Dan Pistone until directed otherwise.  Mr. Sa
18 indicated that he would call Mike Field to clarify that
19 plaintiff did not have to work through Dan Pistone at this
20 time.

21    44.  On April 10, 2007, plaintiff spoke with Bob
22 McGuire, an outside HR consultant for Bridge Bank, who the
23 Bank had put plaintiff in touch with regarding the matter.

24    45.  On April 12 and April 13, 2007, Mike Field
25 pressured plaintiff to continue to work with Dan Pistone, and
26 acted in an adverse manner toward plaintiff, including,
27 without limitation, interfering with her performance of work

28

1  duties and unfairly criticizing her performance and
2  capabilities.

3      46.  On April 25, 2007, plaintiff received an e-mail
4  from Mike Field reprimanding plaintiff for bringing to his
5  attention that the client they would be visiting the next day
6  was one of the matters that was delayed due to the backlog in
7  Dan Pistone's office (a matter that Mr. Field needed to be
8  aware of since it might surface during the client meeting).
9  Mr. Field communicated to plaintiff via e-mail, "Please
10 refrain from further mention of the 'backlog in Pistone's
11 office' talk. You have made your statement repeatedly, let's
12 move forward with business."

13     47.  On April 27, 2007, plaintiff met with Bob Maguire,
14 the outside HR consultant again.  Among other things, Bob
15 Maguire wanted further details on discriminatory comments
16 made by Dan Pistone related to sexual preference, age, and
17 ethnicity.  In reply, plaintiff told Mr. Maguire about a
18 statement that Dan Pistone had made in the workplace that
19 "homosexuality is sacrilege".  Plaintiff also told Mr.
20 Maguire that Dan Pistone had said, as to a senior member of
21 the finance team, that he (Dan Pistone) didn't know why
22 Bridge Bank hired people like that [at that stage of life]
23 because at best, we'll only get another four years out of
24 him.  Finally, plaintiff told Mr. Maguire about a quality
25 candidate referral that she had received from the Associate
26 Dean at San Jose State University.  The woman came from China
27 and had graduated with top honors.  She had an accent, but

28

1  was articulate. She had been working with a language coach

2  to improve her communication skills. Plaintiff was involved

3  in the interview of the candidate with both Mike Field and

4  Dan Pistone. Mr. Field and Mr. Pistone asked a couple of

5  appropriate questions initially, but then they branched into

6  questions to the candidate that were well beyond the expected

7  knowledge of an entry level analyst (which the candidate

8  could not answer). Both Dan Pistone and Mike Field declined

9  to pursue further interviews, stating to plaintiff that the

10  candidate's accent would be a detriment to the Bank.

11      48.  In this same meeting, plaintiff told Bob Maguire

12  that her view of an acceptable outcome to her discrimination

13  complaint, was to be given title, compensation, and authority

14  at least equal to Dan Pistone's, and that she was aware that

15  Mr. Pistone had been granted additional stock options when he

16  was promoted to Senior Vice President, while she had received

17  no such compensation. Plaintiff told Mr. Maguire that the

18  matter of discrimination would have to be addressed.

19  Plaintiff told Mr. Maguire that she believed that she had

20  been a victim of gender discrimination since her initial

21  encounter with the Bank and that with the recent events, the

22  situation had become absolutely unacceptable and intolerable.

23      49.  On May 4, 2007, at about 1:30 p.m., plaintiff had a

24  meeting with Dan Myers (CEO), Tom Sa (CFO and acting in-house

25  head of HR), and Barb Bahl (HR). Dan Myers stated that the

26  Bank had completed its investigation. He stated that if Dan

27  Pistone felt anything discriminatory against women in

28

1  leadership (and Mr. Pistone had assured Dan Myers that he had
2  no issue with it), he (Dan Myers) wanted plaintiff to know
3  that he (Dan Myers) and the Bank did not operate on such a
4  bias.  Mr. Myers further stated that there were lots of women
5  in senior roles at the Bank.  He stated that Dan Pistone's
6  statement of what happened did not match plaintiff's exactly,
7  but Mr. Pistone had acknowledged that things were said that
8  should not have been said.  He stated that the Bank had taken
9  disciplinary action against Mr. Pistone, and that no
10 recurrence was expected.  He stated that Mr. Pistone and Mr.
11 Field had been reminded that there was to be no retaliation;
12 and that if plaintiff felt she was experiencing retaliation,
13 she should go to him (Dan Myers), Tom Sa, or Barb Bahl.  Mr.
14 Myers stated that the outcome might be different than
15 plaintiff expected—that Bob Maguire had told him that
16 plaintiff wanted a position of equal status to Dan Pistone to
17 achieve appropriate resolution, and that he (Dan Myers) did
18 not feel that was an appropriate outcome.  He stated there
19 might be a restructure at some point, but if that were done
20 it would only be done because it would be determined to be in
21 the best interest of the Bank, not because of issues such as
22 this.  Myers stated that he wanted plaintiff to understand
23 that this decision was not gender discrimination; that there
24 was just not a position to move plaintiff into at this time.
25 Mr. Myers acknowledged plaintiff's contribution to the team.
26 He stated that all concerned were to be professional and were
27 to work in their assigned positions professionally.
28

1    50.  Plaintiff requested two points of clarification

2  from Mr. Myers.  She asked him if Dan Pistone was to continue

3  to supervise women, and Dan Myers responded, "Yes."

4  Plaintiff then asked whether she was being instructed to

5  continue to report directly to Dan Pistone, and Dan Myers

6  responded "Yes."

7    51.  Plaintiff indicated to Mr. Myers that she and

8  Bridge Bank were pretty far apart on an acceptable

9  resolution, that she didn't believe that the solution

10  presented by Mr. Myers got to the crux of the issue, and that

11  she would have to think about the matter and get back to him.

12  Plaintiff made it clear to Mr. Myers that it would be

13  unacceptable for her to continue to report to Dan Pistone

14  after all that had happened.

15    52.  Plaintiff felt like she was under extreme stress.

16  Plaintiff was out ill starting Monday, May 7, 2007.  When she

17  saw her doctor on May 9, 2007, the doctor ordered a leave of

18  absence for her for medical disability reasons, including

19  depression and anxiety, until June 10, 2007.  Plaintiff

20  communicated the seriousness of her medical condition/

21  disability to the Bank, and the leave of absence was granted.

22    53.  On May 9, 2007, plaintiff wrote Dan Myers,

23  President and Chief Executive Officer, a letter.  In it she

24  complained that the outcome of the investigation failed to

25  remedy the gender discrimination and very hostile work

26  environment she faced.  She indicated that Dan Pistone had

27  clearly communicated to her that solely because of her

28

1  gender, and despite her knowledge, skills, and abilities,
2  she would be denied the opportunity to lead a team to address
3  the needs of her large, active, and growing portfolio, which
4  would in turn severely limit her ability to advance her
5  career in the bank.  She noted that she had been recruited
6  for the job based on a promise she would be able to grow her
7  portfolio and become a team leader, and that based on her
8  gender, the promises made to her had gone unrealized.  She
9  protested that it was untenable for Dan Pistone to remain in
10  his management position with her having to directly report to
11  him.

12      54.  She noted further that because of the situation
13  that had developed April 4, 2007, and which had continued
14  thereafter, she had been under extreme stress and had found
15  it to be intolerable to be present in the workplace.  She
16  protested that it was untenable for Dan Pistone to remain in
17  his management position with her having to directly report to
18  him.

19      55.  She further indicated that on April 8, 2007, only
20  days after bringing the matter to the attention of Mike
21  Field, she had been taken to the local hospital emergency
22  room where she was treated for extreme anxiety and high blood
23  pressure.  She further noted that since that time, she had
24  had to rely on psychotropic drugs and an increased dosage of
25  blood pressure medication, and had been monitored by her
26  doctor ever since.

27      56.  She communicated that Mike Field had been unduly

28

Complaint—Bowman v. Bridge Bank, et al              20

1  supportive of Dan Pistone in the investigation, and had taken
2  adverse actions against her.  She indicated that Mr. Field
3  had insisted that she continue to work with Dan Pistone
4  throughout the investigation, refused to call on plaintiff's
5  client with her without Dan Pistone being present (even
6  though it was not necessary Dan Pistone be present), defended
7  Dan Pistone through subtle reprimands of plaintiff, and had
8  attempted to create an issue with plaintiff by claiming she
9  was making a conscious choice not to work with Dan Pistone
10 while the investigation was going on.  She further indicated
11 in her letter that Field had become unduly critical of her
12 work, had constantly challenged the positions which she
13 recommended, had become unreasonably demanding in terms of
14 turn-around expectations, had been insensitive to the fact
15 that there was inadequate support of plaintiff at the office,
16 and had failed to recognize that in order for her to meet the
17 needs of her portfolio, she routinely had to work nights and
18 weekends.
19      57.  She wrote further that, "For the reasons that I
20 have outlined above, the atmosphere in the Technology Banking
21 Group under the leadership of Mike Field and Dan Pistone is
22 intolerable for me.  By forcing me to continue to work under
23 their leadership and to report directly to Dan, you are
24 putting me in a position in which my health will continue to
25 be compromised and my career will be placed in jeopardy, as
26 my work performance is continually and unduly questioned."
27      58.  She indicated that she needed to be provided a
28

Complaint—Bowman v. Bridge Bank, et al          21

1  different reporting channel, and that the reporting channel
2  she faced (direct report to Dan Pistone) was in and of itself
3  continuing to cause a hostile work environment.

4      59.  She also requested the Bank demonstrate its
5  commitment to equal rights and opportunities for women by
6  providing a title, authority, and total compensation to her
7  at least equivalent to Dan Pistone's, and that the Bank
8  provide her with experienced underwriting and analyst support
9  in order to improve the efficiencies in the practice.

10      60.  On May 14, 2007, Dan Myers, President and Chief
11  Executive Officer wrote a letter to plaintiff. He indicated
12  that it was not appropriate for plaintiff to receive a
13  promotion or a pay raise, inferring that plaintiff was not
14  being discriminated against and was at the proper level with
15  the proper job duties and proper title, that she should not
16  be a team leader or have some other type of leadership role,
17  and that she was receiving the proper pay and compensation.
18  He indicated that there was no basis supporting a pay
19  increase for plaintiff or a restructuring of the department
20  involving her role in it. Myers stated categorically, "You
21  have not been subjected to harassing conduct or speech."  He
22  also stated that ". . . no adverse employment action has
23  occurred:  you have not been denied a promotion or a pay
24  increase."

25      61.  On May 22, 2007, plaintiff wrote Dan Myers, CEO and
26  President, a letter, asking him what safeguards were in place
27  to protect her from Dan Pistone's "deep seated gender bias"

28

1  and Mike Field's retaliation against her on Dan Pistone's
2  behalf.  She took issue with Myers' view that no "adverse
3  employment actions" had taken place.  She also indicated that
4  she was not complaining only about being denied a future
5  opportunity or promotion, but was complaining about the "real
6  and present opinion of her direct supervisor" (Dan Pistone)
7  that she was unfit ever to be a team leader solely on the
8  basis of her gender (an opinion which had never been repented
9  or recanted or withdrawn by him), and an opinion which in
10  turn affected her ability to do her present job because of
11  his expressed belief that she was less credible as a banker
12  because she was a woman.
13      62.  In her May 22, 2007 letter, plaintiff indicated
14  that Dan Pistone's "admitted sexism is likely to be
15  determinative of his decision making regarding my career on
16  all levels."  She asked  "Knowing what you now know of Dan
17  Pistone's unwarranted prejudice against females in banking,
18  (not to mention Mike Field's willingness to retaliate against
19  me for making a complaint against Dan), what effective steps
20  have you taken to correct or to prevent further, illegal
21  discrimination from occurring?"  She indicated that she could
22  not understand how Mr. Myers had concluded that she had "not
23  been subjected to harassing conduct or speech" given the
24  prejudicial remarks which had been made by Dan Pistone about
25  women in banking and the retaliation which had occurred when
26  plaintiff had protested.
27      63.  Plaintiff went on to state in her May 22, 2007
28

1  letter that Dan Pistone and Mike Field had created ". . .a

2  work environment that is so hostile to me, as a woman, that

3  it has caused me serious health problems, which have resulted

4  in my having to seek significant, ongoing medical treatment,

5  after having to undergo emergency medical intervention.

6  Plainly said, my work environment is so intolerable that it

7  makes me sick.  My medical doctor has advised me to stay away

8  from work for an extended period of time, simply to recover

9  from the harm that has been done thus far.  He has also

10 warned me that returning to the same environment will cause

11 me further, serious health problems.  The harassment that I

12 am subjected to is so 'severe' and 'pervasive' that I cannot

13 be at work without becoming ill."

14     64.  In her May 22, 2007 letter, plaintiff went on to

15 state that she felt it was ongoing harassment for her to be

16 "forced to work under the supervision of a man who believes

17 that I am unfit to perform certain job functions, *because I*

18 *am a woman*", for her to continue "to have to endure the

19 punitive retaliatory treatment of his friend and our common,

20 male supervisor", for Myers to deny that anything that had

21 occurred was harassment and that instead claim that her

22 complaint was a ploy for "a promotion and pay raise", and

23 then to tell her "to come back to work, because (despite your

24 belief that I was not harassed), you have taken 'proper

25 remedial action' to correct the situation".

26     65.  She closed her May 22, 2007 letter by asking what

27 Myers was going to do to make it possible for her to return

28

1   to a work environment that was safe for her both as a female
2   and as a complainant.  She indicated she did not want to be
3   forced out of her employment.

4       66. Defendants had an attorney write back plaintiff a
5   letter on their behalf dated June 1, 2007 in response to her
6   May 22, 2007 letter addressed to Dan Myers.  The June 1, 2007
7   letter essentially reiterated that it was Bridge Bank's
8   position that plaintiff had not been harassed, had not been
9   discriminated against, had not been subjected to adverse
10  employment actions, had not been retaliated against, and had
11  not and was not being asked to work in a hostile work
12  environment.  The letter stated, "While you know the buzz
13  words, I do not believe you are aware of their legal
14  significance.  You have suffered no adverse employment
15  action, whether that term is construed narrowly or broadly.
16  **Succinctly put, nothing has happened.**" (Emphasis added.)

17      67. The June 1, 2007 reply letter offered no change in
18  reporting relationship or any other substantive, corrective,
19  or remedial relief to plaintiff.  The letter stated, "You
20  have been assured that it is not Bridge Bank's policy or
21  practice to engage in unlawful discrimination, and you have
22  been reminded of the proof of that:  the fact that the Bank
23  has, and has had, successful women in leadership positions."
24  (However, the letter was silent about plaintiff ever
25  receiving a leadership position, either presently or in the
26  future.)

27      68.  The June 1, 2007 letter went on to state that the
28

Complaint—Bowman v. Bridge Bank, et al              25

1  Bank "currently has no plans to restructure the Technology

2  Banking Group…"   The letter concluded with the words, "It is

3  now up to you to decide whether or not you will return to

4  your position."

5      69.   The leave of absence which plaintiff received for

6  medical disability reasons was extended thereafter by

7  plaintiff's doctors.   The first such extension of the leave

8  of absence was provided on or about June 8, 2007, which

9  extended the leave of absence until July 20, 2007.   The

10  second such extension was provided to plaintiff by Dr.

11  Douglas Harper, plaintiff's treating psychiatrist, on or

12  about July 16, 2007, which extended the leave of absence to

13  on or about August 20, 2007.

14      70.   In response to plaintiff's last request for

15  extension of medical disability leave ordered by Dr. Harper

16  and submitted to the Bank, Thomas Sa of Bridge Bank wrote

17  plaintiff back on July 23, 2007 that ". . . as an

18  accommodation to you, Bridge Bank is willing to grant you a

19  personal leave from August 2 through August 20.  **Please note**

20  **that your job is not guaranteed during the period of personal**

21  **leave."**   (Emphasis added.)

22      71.   Essentially, there were a number of back and forth

23  communications between Bridge Bank and plaintiff during the

24  period plaintiff was out on medical disability leave.   Bridge

25  Bank refused to change its position, and indicated that

26  plaintiff would need to continue to report directly to Dan

27  Pistone (despite plaintiff's objections thereto), and also

28

1  denied plaintiff's request for promotion to a position with

2  management duties and an increase in pay.  Bridge Bank also

3  refused to put in place adequate and appropriate steps to

4  address Dan Pistone's and Mike Field's discriminatory and

5  retaliatory conduct.  Plaintiff made clear to Bridge Bank

6  that her physicians had indicated that the issues she had

7  with Dan Pistone and Mike Field pertaining to sex

8  discrimination, harassment, hostile work environment, and

9  retaliation had made her seriously ill, and that based on the

10  medical problems/disabilities she was having she could not

11  continue to work directly under Dan Pistone's direct

12  supervision, and that it would seriously and adversely affect

13  her health to do so.  In addition to inquiring about whether

14  plaintiff could have a promotion and a pay raise (which

15  requests were denied), plaintiff inquired in a more open-

16  ended way about any other ways plaintiff could be reasonably

17  accommodated and/or receive corrective remedial action, even

18  without a pay raise and promotion, so that she would not have

19  to continue to work under Dan Pistone's direct supervision.

20  Plaintiff was aware there were other openings in other

21  departments/divisions within the Bank which she was qualified

22  for.  In this regard, if the Bank had agreed, plaintiff could

23  have gone to work in a capacity similar to the one she was

24  working in, but on a different team (other than Dan Pistone's

25  team).  However, Bridge Bank was insistent that plaintiff had

26  no choice but to continue to work on Dan Pistone's team under

27  his direct supervision, despite plaintiff's request for

28

Complaint—Bowman v. Bridge Bank, et al          27

1  reasonable accommodation and despite the medical and health
2  need to not have to work directly for Dan Pistone related
3  directly to plaintiff's disability.  Bridge Bank was
4  insistent that there had not been and was not any harassment,
5  any harassing speech, any hostile work environment, or any
6  discrimination; and Bridge Bank indicated that plaintiff's
7  sole choice was to come back to work on Dan Pistone's team
8  and under his direct supervision, with no change and no
9  restructuring, just like the situation was before April 4,
10  2007.  It insisted on this despite plaintiff's and her
11  doctor's entreaties that plaintiff was not able to return to
12  this same situation as before from a health standpoint, that
13  it was intolerable, that it would seriously compromise and
14  hurt her health, and that she would be forced to quit in such
15  case.

16      72.  Throughout plaintiff's employment, Dan Pistone
17  would insist that, as part of plaintiff's duties, plaintiff
18  proofread, correct, and extensively edit and rewrite
19  coursework he (Dan Pistone) would be turning in for a banking
20  school he was going to in order to advance his career, which
21  plaintiff did, because he was plaintiff's boss and he was
22  instructing plaintiff to do so.

23      73.  On July 24, 2007, plaintiff felt forced to resign
24  and was constructively discharged from Bridge Bank because of
25  the intolerable working conditions she was facing, as
26  aforesaid. Also, because Bridge Bank was insisting plaintiff
27  continue to work under the supervision of Dan Pistone, which
28

1  plaintiff's doctors were advising her she could not do
2  because of her medical issues/disabilities, it was impossible
3  for plaintiff to return to work, and continued to remain
4  impossible for plaintiff to return to work.  Bridge Bank
5  continued to insist that plaintiff continue to work under Dan
6  Pistone's supervision despite her pointing out to Bridge Bank
7  that the disability she had precluded her from doing so,
8  despite the fact she sought a reasonable accommodation, and
9  despite the fact that there were other positions available
10 which plaintiff could have worked in at Bridge Bank for which
11 she was qualified, and despite the fact plaintiff's work
12 could have been restructured or some other reasonable
13 accommodation could have been made so plaintiff would not
14 have needed to continue to work under Dan Pistone's direct
15 supervision.
16     74.  Plaintiff is informed and believes that shortly
17 after she was separated from her employment, another male
18 discussed with Dan Pistone the possibility of going to work
19 on the technology team with Bridge Bank, and Dan Pistone
20 described the position to him as including management
21 responsibilities (which plaintiff had requested, but had been
22 denied).
23     75.  Plaintiff is also informed and believes that
24 shortly after she was separated from her employment, the
25 technology team was shortly thereafter restructured and
26 broken up into sub-units pertaining to which certain male
27 Vice President relationship managers on the technology team
28

1  were given a management role, something which had been denied
2  to plaintiff (who had been a Senior Vice President female
3  relationship manager at the time.)   Plaintiff is informed and
4  believes she was substantially more qualified than the male
5  Vice President relationship manager employees who received
6  leadership roles on the technology team after her separation
7  from Bridge Bank, based on her much greater experience in
8  banking, leadership, and management and her higher title
9  (Senior Vice President, Relationship Manager as opposed to
10  the males who received the management role who had the title
11  of Vice President, Relationship Manager).

12      76.   Plaintiff has met all administrative requirements
13  prior to filing a lawsuit for violation of Title VII, and is
14  filing this lawsuit within 90 days after issuance of a Notice
15  of Right to Sue by the U.S. Equal Employment Opportunity
16  Commission.

17      77.   Defendants and each of them have violated 42 U.S.C.
18  Section  2000e-2  in  that  the  have  discriminated  against
19  plaintiff  because  of  her  sex  (female)  with  respect  to  the
20  terms  and  conditions  of  her  employment,  including,  without
21  limitation,  as  follows:    (a) by  subjecting  her  to  unwelcome
22  offensive  harassment  and  a  hostile  work  environment  based  on
23  her  sex  (female),  and  by  ratifying  said  sexual  harassment  and
24  hostile  work  environment;  (b) by  failing  to  take  adequate,
25  appropriate,  prompt  remedial  and/or  corrective  action  to
26  remedy  the  sexual  harassment  and  hostile  work  environment
27  problem  she  was  facing;  (c) by  failing  to  adequately  address,

28

1  adequately correct, or adequately respond to the sex
2  harassment/hostile environment situation; (d) by failing to
3  take all reasonable steps necessary to prevent harassment and
4  hostile environment related to her sex (female) from occurring
5  and continuing to occur; (e) by refusing to provide
6  accommodation for her disability/medical condition related to
7  her sex (female) and the sexual harassment/hostile working
8  environment she had experienced; (f) by forcing her to quit
9  based on her sex (female); (g) by constructively discharging
10 her based on her sex (female); (h) by denying her viable
11 employment based on her sex (female); (i) by engaging in a
12 pattern and practice of not hiring her and not promoting her
13 to supervisory, managerial, team leader, and other leadership
14 positions, based on her sex (female); (j) by denying her equal
15 opportunity to compete for and be considered for positions
16 based on her sex (female); (k) by discriminating against her
17 in assignment of duties based on her sex (female); (l) by
18 discriminating against her in evaluating her based on her sex
19 (female); (m) by delaying and by making restructuring and/or
20 other employment decisions, to plaintiff's detriment, based on
21 plaintiff's sex (female); (n) by denying plaintiff management
22 responsibilities based on her sex (female); (o) by denying
23 plaintiff a transfer to other positions, based on her sex
24 (female); (p) by discriminating against plaintiff in
25 compensation, based on her sex (female); (q) by discriminating
26 against plaintiff in stock options, based on her sex (female);
27 (r) by discriminating against plaintiff by threatening to
28

1  terminate her for taking a leave of absence based on her sex
2  (female); (s) by taking adverse personnel actions against her
3  based on her sex (female); and (t) by discriminating against
4  plaintiff in terms and conditions of her employment based on
5  her sex (female).

6  78.  Defendants and each of them have violated 42 U.S.C.
7  Section 2000e-3 in that they have discriminated and retaliated
8  against plaintiff, including, without limitation, based on and
9  related    to    her    protesting    and    opposing    sex
10  harassment/discrimination in violation of Title VII, by acting
11  in an adverse and hostile way to her in response thereto,
12  including, without limitation, as follows: (a) by refusing to
13  provide accommodation for her disability/medical condition;
14  (b) by forcing her to quit; (c) by constructively discharging
15  her; (d) by denying her viable employment; (e) by continuing
16  to not promote her; (f) by denying her equal opportunity to
17  compete for and be considered for positions with defendants;
18  (g) by discriminating against her in assignment of duties;
19  (h) by delaying restructuring and/or by delaying and/or making
20  other employment decisions, to plaintiff's detriment; (i) by
21  denying plaintiff management responsibilities; (j) by denying
22  plaintiff a transfer to other positions; (k) by discriminating
23  against plaintiff in compensation; (l) by discriminating
24  against plaintiff in stock options; (m) by discriminating
25  against plaintiff by threatening to terminate her for taking a
26  leave of absence; (n) by taking adverse personnel decisions
27  against her; and (o) by discriminating against plaintiff in
28

1  terms and conditions of her employment.

2      79.  As a proximate result of said unlawful conduct by
3  said defendants, plaintiff has sustained, and continues to
4  sustain, economic loss in an amount to be shown according to
5  proof.

6      80.  As a proximate result of said unlawful conduct,
7  plaintiff has suffered, and continues to suffer, emotional
8  distress, mental anguish, shame, embarrassment, humiliation,
9  pain and suffering, loss of enjoyment of life, and injury to
10  reputation, in an amount in excess of the amount required to
11  be in controversy to invoke the original jurisdiction of this
12  Court, to be shown according to proof.

13      81.  As a proximate result of said unlawful conduct,
14  plaintiff has incurred medical and health expenses in an
15  amount    to    be    shown    according    to    proof.

16      82.  The aforesaid conduct of the defendants was
17  willful, malicious, and oppressive, and plaintiff is entitled
18  to an award of punitive damages in an amount to be shown
19  according to proof.

20      83.  Plaintiff has had to hire attorneys to prosecute
21  the matter herein, and is entitled to an award of reasonable
22  attorneys' fees and costs, according to proof.

23      WHEREFORE, plaintiff prays judgment against defendants
24  and each of them, as set forth below.

25                  SECOND CAUSE OF ACTION

26    (Violation of Americans with Disabilities Act, Against

27  Defendants Bridge Bank of Silicon Valley, N.A., Bridge Bank,

28

Complaint—Bowman v. Bridge Bank, et al          33

1    <u>N.A., and Bridge Capital Holdings</u>)

2    84.    Plaintiff refers to the allegations of paragraphs 1-
3    76 of this complaint and incorporates the same herein by this
4    reference as though set forth in full.

5    85.    Plaintiff has exhausted in a timely fashion all
6    administrative requirements prior to filing an action under
7    the Americans with Disabilities Act, 42 U.S.C. Section 12112
8    et seq., and is bringing this cause of action in a timely
9    fashion.    She has received notice of right to sue from the
10   Equal Employment Opportunity Commission, and has filed this
11   cause of action within 90 days of receipt of the notice of
12   right to sue against each of the named defendants.

13   86. Defendants and each of them have violated plaintiff's
14   rights under the Americans with Disabilities Act, 42 U.S.C.
15   Sections 12112 et seq., including without limitation, as
16   follows:    Defendants discriminated against plaintiff based on
17   her psychological disability, and their perception thereof,
18   in connection with the terms, conditions, and privileges of
19   her employment, as aforesaid, including, without limitation,
20   (a) taking adverse personnel actions against plaintiff,
21   including, without limitation, forcing her to quit her
22   employment and/or constructively discharging her from
23   employment and/or denying her employment on the basis of
24   disability; (b) utilizing standards, criteria, or methods of
25   administration which  had the effect of discrimination on the
26   basis of disability, (c) excluding or otherwise denying equal
27   jobs or benefits to plaintiff because of a known disability,

28

(d) not making a reasonable accommodation to plaintiff's known disability; (e) forcing plaintiff to quit her employment and denying her a transfer to another position based on the need to make a reasonable accommodation to her based on disability, and (f) failing to engage in a timely, good faith, interactive process to determine effective reasonable accommodations in response to a request for reasonable accommodation by an employee with a known disability.

87. As a proximate result of said defendants' violations of the Americans with Disabilities Act, plaintiff has suffered, and continues to suffer, economic loss, with prejudgment interest thereon, in an amount to be shown according to proof.

88. As a further proximate result of said defendants' violation of the Americans with Disabilities Act, plaintiff has suffered, and continues to suffer, pain and suffering, emotional distress, mental anguish, shame, embarrassment, humiliation, loss of enjoyment of life, and injury to reputation, and is entitled to an award of damages to compensate her therefore, in an amount in excess of the amount required to be in controversy to invoke the original jurisdiction of this Court, in an amount to be shown according to proof.

89. As a further proximate result of said defendants' violation of the Americans with Disabilities Act, plaintiff has incurred medical and health expenses in an amount to be

1  shown according to proof.

2      90.    Said defendants' violation of plaintiff's rights

3  under the Americans with Disabilities Act has been malicious

4  and oppressive, and plaintiff is entitled to an award of

5  punitive and exemplary damages therefore, in an amount to be

6  shown according to proof.

7      91.    Plaintiff has been compelled to engage the services

8  of attorneys in order to prosecute the action herein, and is

9  accordingly entitled to an award of reasonable attorneys' fees

10 and costs, in an amount to be shown according to proof.

11     WHEREFORE, plaintiff prays judgment against defendant as

12 set forth below.

13                    THIRD CAUSE OF ACTION

14     (Violation of Equal Pay Act, 29 U.S.C. Section 206(d),

15 Against Defendants Bridge Bank of Silicon Valley, N.A., Bridge

16          Bank, N.A., and Bridge Capital Holdings)

17     92.    Plaintiff refers to the allegations of paragraphs

18 1-75 of this complaint, and incorporates the same herein by

19 this reference as though set forth in full herein.

20     93. Since defendants' commencement of employment with

21 defendants on or about July 1, 2005 until plaintiff's last

22 date of employment with defendants on or about July 24, 2007,

23 defendants have continuously discriminated against plaintiff

24 by paying wages to her (including salary, stock options, and

25 other compensation) at a rate less than the rate at which it

26 paid wages to male employees for equal work on jobs the

27 performance of which required equal skill, effort, and

28

1  responsibility, and which were performed under similar

2  working conditions.

3      94.   Defendants' violation of 29 U.S.C. Section 206(d),

4  as aforesaid, was willful.

5      95.   As a proximate result of said unlawful violation of

6  29 U.S.C. Section 206(d), plaintiff has been deprived of

7  wages, and interest thereon, arising out of the unequal pay

8  she received, as aforesaid, and is entitled to an award in

9  the amount of the wages, and interest thereon, of which she

10 was deprived by reason of the violation, and in an additional

11 equal amount as liquidated damages, all in an amount to be

12 shown according to proof.

13     96.   Pursuant to the provisions of 29 U.S.C. Sections

14 206(d) and 216, plaintiff hereby consents to being a party in

15 the bringing of this claim in this Court under the Equal Pay

16 Act.

17     97.   Pursuant to the provisions of 29 U.S.C. Sections

18 206(d) and 216, plaintiff has had to hire attorneys to bring

19 this action, and is entitled to an award of reasonable

20 attorneys' fees and costs, in an amount to be shown according

21 to proof.

22     WHEREFORE, plaintiff prays judgment against defendant as

23 set forth below.

24                    FOURTH CAUSE OF ACTION

25 (Violation of California Fair Employment and Housing Act—Cal.

26    Gov't. Code Sections 12940(j), (a), (m), (n), and (h)),

27                    Against All Defendants)

28

98.   Plaintiff refers to the allegations of paragraphs 1-75, and incorporates the same herein by this reference as though set forth in full.

99.   Plaintiff has exhausted all administrative steps required to be taken by her prior to bringing a claim for violation of the California Fair Employment and Housing Act, and brings said claim in a timely fashion.

100.   Defendants and each of them have violated various provisions of the California Fair Employment and Housing Act, including, without limitation, as follows:

(a) Defendants have violated Section 12940(j) of the California Fair Employment and Housing Act, including, without limitation, as follows: (1) by subjecting plaintiff to unwelcome offensive harassment and a hostile work environment based on her sex (female), and by ratifying said sexual harassment and hostile work environment; (2) by failing to take adequate, appropriate, prompt remedial and/or corrective action to remedy the sexual harassment and hostile work environment problem she was facing; (3) by failing to adequately address, adequately correct, or adequately respond to the sex harassment/hostile environment situation; and (d) by failing to take all reasonable steps necessary to prevent harassment and hostile environment related to her sex (female) from occurring and continuing to occur.

(b) Defendants have violated the sex discrimination provisions of Section 12940(a) of the California Fair Employment and Housing Act, including, without limitation, as

Complaint—Bowman v. Bridge Bank, et al      38

1  follows: (1) by refusing to provide accommodation for
2  plaintiff's disability/medical condition related to her sex
3  (female) and the sexual harassment/hostile working environment
4  she had experienced; (2) by forcing plaintiff to quit based on
5  her sex (female); (3) by constructively discharging plaintiff
6  based on her sex (female); (4) by denying plaintiff viable
7  employment based on her sex (female); (5) by engaging in a
8  pattern and practice of not hiring plaintiff and not promoting
9  her to supervisory, managerial, team leader, and other
10  leadership positions, based on her sex (female); (6) by
11  denying plaintiff equal opportunity to compete for and be
12  considered for positions based on her sex (female); (7) by
13  discriminating against plaintiff in assignment of duties based
14  on her sex (female); (8) by discriminating against plaintiff
15  in evaluating her based on her sex (female); (9) by delaying
16  and by making restructuring and/or other employment decisions,
17  to plaintiff's detriment, based on plaintiff's sex (female);
18  (10) by denying plaintiff management responsibilities based on
19  her sex (female); (11) by denying plaintiff a transfer to
20  other positions, based on her sex (female); (12) by
21  discriminating against plaintiff in compensation, based on her
22  sex (female); (13) by discriminating against plaintiff in
23  stock options, based on her sex (female); (14) by
24  discriminating against plaintiff by threatening to terminate
25  her for taking a leave of absence based on her sex (female);
26  (15) by taking adverse personnel decisions against plaintiff
27  based on her sex (female); and (16) by discriminating against
28

1   plaintiff in terms and conditions of her employment based on

2   her sex (female).

3        (c) Defendants have violated the disability

4   discrimination provisions of the California Fair Employment

5   and Housing Act, including, California Government Code

6   Sections 12940(a), (m), and (n), including, without

7   limitation, in that defendants discriminated against

8   plaintiff based on her psychological disability, and their

9   perception thereof, in connection with the terms, conditions,

10  and privileges of her employment, as aforesaid, including,

11  without limitation, (1) taking adverse personnel actions

12  against plaintiff, including, without limitation, forcing her

13  to quit her employment and/or constructively discharging her

14  from employment and/or denying her employment on the basis of

15  disability; (2) utilizing standards, criteria, or methods of

16  administration which  had the effect of discrimination on the

17  basis of disability, (3) excluding or otherwise denying equal

18  jobs or benefits to plaintiff because of a known disability,

19  (4) not making a reasonable accommodation to plaintiff's

20  known disability; (5) forcing plaintiff to quit her

21  employment and denying her a transfer to another position

22  based on the need to make a reasonable accommodation to her

23  based on disability, and (6) failing to engage in a timely,

24  good faith, interactive process to determine effective

25  reasonable accommodations in response to a request for

26  reasonable accommodation by an employee with a known

27  disability.

28

Complaint—Bowman v. Bridge Bank, et al

1    (d)    Defendants and each of them have violated
2  California Government Code Section 12940(h) in that they have
3  discriminated and retaliated against plaintiff, including,
4  without limitation, based on and related to her protesting and
5  opposing sex harassment/discrimination, as aforesaid, by
6  acting in an adverse and hostile way to her in response
7  thereto, including, without limitation, as follows: (a) by
8  refusing to provide accommodation for her disability/medical
9  condition; (b) by forcing her to quit; (c) by constructively
10 discharging her; (d) by denying her viable employment; (e) by
11 continuing to not promote her; (f) by denying her equal
12 opportunity to compete for and be considered for positions
13 with defendants; (g) by discriminating against her in
14 assignment of duties; (h) by delaying restructuring and/or by
15 delaying and/or making other employment decisions, to
16 plaintiff's detriment; (i) by denying plaintiff management
17 responsibilities; (j) by denying plaintiff a transfer to other
18 positions; (k) by discriminating against plaintiff in
19 compensation; (l) by discriminating against plaintiff in stock
20 options; (m) by discriminating against plaintiff by
21 threatening to terminate her for taking a leave of absence;
22 (n) by taking adverse personnel decisions against her; and (o)
23 by discriminating against plaintiff in terms and conditions of
24 her employment.
25    101.  As a proximate result of said defendants' unlawful
26 conduct, as aforesaid, plaintiff has suffered, and continues
27 to suffer, economic loss, with prejudgment interest thereon,
28

1 in an amount to be shown according to proof.

2      102.  As a further proximate result of said defendants'
3 unlawful conduct, as aforesaid, plaintiff has suffered, and
4 continues to suffer, pain and suffering, emotional distress,
5 mental anguish, shame, embarrassment, humiliation, loss of
6 enjoyment of life, and injury to reputation, and is entitled
7 to an award of damages to compensate her therefor, in an
8 amount in excess of the amount required to be in controversy
9 to invoke the original jurisdiction of this Court, to be shown
10 according to proof.

11      103.  As a further proximate result of said defendants'
12 unlawful conduct, as aforesaid, plaintiff has incurred medical
13 and health expenses in an amount to be shown according to
14 proof.

15      104.  Said defendants' violation of plaintiff's rights
16 under the California Fair Employment and Housing Act has been
17 malicious and oppressive, and plaintiff is entitled to an
18 award of punitive and exemplary damages therefore, in an
19 amount to be shown according to proof.

20      105.  Plaintiff has been compelled to engage the services
21 of attorneys in order to prosecute the action herein, and is
22 accordingly entitled to an award of reasonable attorneys' fees
23 and costs, in an amount to be shown according to proof.

24      WHEREFORE, plaintiff prays judgment against defendant as
25 set forth below.

26                    FIFTH CAUSE OF ACTION
27      (Violation of California Labor Code Section 1197.5, Against
28

Complaint—Bowman v. Bridge Bank, et al        42

All Defendants)

106.  Plaintiff refers to the allegations of paragraphs 1-75 of this complaint, and incorporates the same herein by this reference as though set forth in full.

107. Since defendants' commencement of employment with defendants on or about July 1, 2005 until plaintiff's last date of employment with defendants on or about July 24, 2007, defendants have continuously discriminated against plaintiff by paying wages to her (including salary, stock options, and other compensation) at a rate less than the rate at which it paid wages to male employees for equal work on jobs the performance of which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

108. Defendants' violation of California Labor Code Section 1197.5, as aforesaid, was willful.

109.  As a proximate result of said unlawful violation of California Labor Code Section 1197.5, as aforesaid, plaintiff has been deprived of wages, and interest thereon, arising out of the unequal pay she received, as aforesaid, and is entitled to an award in the amount of the wages, and interest thereon, of which she was deprived by reason of the violation, and in an additional equal amount as liquidated damages, in an amount to be shown according to proof.

110.  Pursuant to the provisions of California Labor Code Section 1197.5, plaintiff has had to hire attorneys to bring this action, and is entitled to an award of reasonable

1 | attorneys' fees and costs, in an amount to be shown according
2 | to proof.
3 |     WHEREFORE, plaintiff prays judgment against defendants
4 | and each of them as follows:
5 |     1.  For general damages, according to proof;
6 |     2.  For special damages, according to proof;
7 |     3.  For an award of liquidated damages, according to
8 | proof;
9 |     4.  For punitive and exemplary damages, according to
10 | proof;
11 |     5.  For an award of reasonable attorneys' fees and
12 | costs, according to proof;
13 |     6.  For costs of suit; and
14 |     7.  For such other and further relief as this Court
15 | deems just and proper.
16 | DATED:  _____May 6_____ , 2008.

LOUIS A. HIGHMAN
BRUCE J. HIGHMAN
HIGHMAN, HIGHMAN & BALL

By_____
Attorneys for Plaintiff
Debra Springer-Bowman

CONSENT TO BEING A PLAINTIFF IN THIS ACTION

    Plaintiff Debra Springer-Bowman hereby consents to
being a plaintiff to all causes of action set forth in the
above-entitled action.

DATED: _____May 8_____ , 2008.

_____
DEBRA SPRINGER-BOWMAN

1

## DEMAND FOR JURY TRIAL

2      Plaintiff Debra Springer-Bowman, by and through her

3  attorneys, hereby demands a jury trial in the above-entitled

4  matter.

5     DATED: _____May 6_____, 2008.

6                           LOUIS A. HIGHMAN
BRUCE J. HILGHMAN

7                         HIGHMAN, HIGHMAN & BALL

8

9                   By
                         Attorneys for Plaintiff

10                       Debra Springer-Bowman

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint-Bowman v. Bridge Bank, et al     45

✥ JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| DEBRA SPRINGER-BOWMAN | BRIDGE BANK OF SILICON VALLEY, N.A.; BRIDGE BANK, N.A.; BRIDGE CAPITAL HOLDINGS, |

| (b) County of Residence of First Listed Plaintiff    Santa Clara County<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |
|---|---|
| (c) Attorney's (Firm Name, Address, and Telephone Number)<br>Louis A. Highman, Bruce J. Highman<br>Highman, Highman & Ball<br>870 Market Street, Suite 467<br>San Francisco, CA 94102<br>(415) 982-5563 | Attorneys (If Known)    Uncertain |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff

(For Diversity Cases Only) N.A. and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury— Med. Malpractice<br>☐ 365 Personal Injury — Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☒ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus – Alien Detainee<br>☐ 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Title VII, ADA, Equal Pay Act

Brief description of cause: Sex discrimination, harassment, and retaliation; disability discrimination;Equal Pay Act violations; and pendent state law claims.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ gen., special, pun. dam.,liquidated dam. & atty    CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".    N.A.    fees according to proof.

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2) (PLACE AN "X" IN ONE BOX ONLY)

☐ SAN FRANCISCO/OAKLAND    ☒ SAN JOSE

DATE    SIGNATURE OF ATTORNEY OF RECORD